UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------X
                                              :
VYACHESLAV DIGILOV,                           :
                                              :
                              Plaintiff,      :
                                              :
                    v.                        :
                                              :
JPMORGAN CHASE BANK, N.A.,                    :
                                              :
                              Defendant.  :
                                              :
----------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 18, 2015
```

13 Civ. 975 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Vyacheslav Digilov (sometimes known as "Slava," but referred to in this Opinion as "Digilov" or "Plaintiff") brings this action against JPMorgan Chase Bank, N.A. ("JPMorgan Chase" or "Defendant") for discrimination and retaliation on the basis of age in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621-634, the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. Law §§ 290-301, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code §§ 8-101 to 8-131.  Plaintiff alleges that Defendant failed to promote on account of his age, and retaliated against him for complaining of discrimination on the basis of age.  Defendant moves for summary judgment on both claims.  For the reasons set forth in this Opinion, the Court denies the motion for summary judgment.

## BACKGROUND[1]

### A.  Factual Background

### 1.   Plaintiff's Employment History with Defendant

Essential to an understanding of Plaintiff's claims is an understanding of Defendant's employment practices, both generally and as they impacted Plaintiff.  By way of background, Digilov was born in the former Soviet Union on July 21, 1953.  (Def. 56.1 ¶ 1).  He was hired by Defendant as an assistant branch manager at its Hoboken, New Jersey branch in October 2005, at the age of 52.  (*Id.* at ¶¶ 4-5).  In or about October 2006, Plaintiff was assigned to the Amboy Montreal branch in Staten Island.  (*Id.* at ¶¶ 6-7).  In September 2011, Plaintiff was reassigned on a temporary basis, and then a permanent one, to the Pleasant Plains branch in Staten Island (*id.* at ¶¶ 7, 82; Pl. 56.1 ¶ 15), where he remained until taking a leave of absence that began on May 21, 2012, and continues to the present day (Def. 56.1 ¶¶ 8-9).

As an assistant branch manager at JPMorgan Chase, Digilov's primary responsibilities "focused on the branch's non-sales operations," and included

> managing critical operation metrics to minimize risks and losses; directly supervising and coaching the Teller staff; maintaining high standards for cash control, monetary transactions, branch security procedures, and account opening activities; ensuring the entire

---

[1]     The facts in this Opinion are drawn from Defendant's Local Rule 56.1 Statement ("Def. 56.1"); Plaintiff's Local Rule 56.1 Counterstatement ("Pl. 56.1"); and the declarations and affidavits ("[Name] Decl.") and exhibits thereto submitted with the parties' briefs. Where appropriate, the Court has adopted the naming and capitalization conventions used by the parties.  Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.  Where cited directly, deposition testimony is cited as "[Name] Dep."  Finally, Defendant's opening brief is referred to as "Def. Br."; Plaintiff's opposition as "Pl. Opp."; and Defendant's reply brief as "Def. Reply."

> branch staff is trained and follows policies and
> procedures; ensuring satisfactory audit ratings;
> scheduling staff based on customer traffic and branch
> hours; and assisting with Teller transactions during
> peak volume periods.

(Def. 56.1 ¶ 10).  By contrast, branch managers "are primarily responsible for

the branch's sales operations," including supervising personal bankers and

partnering with business bankers, financial advisors, and loan officers who

work in the branch, as well as having "overall responsibility for the branch."

(*Id.* at ¶ 11).  However, assistant managers do "support the Branch Manager in

the general management of the branch" (*id.* at ¶ 10), and Plaintiff's

responsibilities did at times stray into sales (Pl. 56.1 ¶ 10).

Digilov reported to various branch managers throughout his tenure at

JPMorgan Chase.  At the Amboy Montreal branch, he reported from October

2006 until sometime in 2010 to Calvin Haynes; from then until late 2010 to

Gladys David; from late 2010 until July 2011 to Alfredo Valentin; and from

July 2011 until September 13, 2011, to Laurie Guinta.  (Def. 56.1 ¶¶ 12-15).

From September 13, 2011, to October 5, 2011, Plaintiff was the highest-

ranking employee at the Pleasant Plains branch, as both the branch manager

and assistant branch manager were on leave.  (Pl. 56.1 ¶ 15; Digilov Decl.

¶¶ 51-59).  This period came to an end when Judith Renner became branch

manager of the Pleasant Plains branch and Plaintiff continued as assistant

branch manager.  (Def. 56.1 ¶ 16; Digilov Decl. ¶ 59).  During the relevant time

period both the Amboy Montreal and Pleasant Plains branches were under the

overall supervision of Marni Chua, who replaced Lynn Autrum in early 2010 as

the district manager for JPMorgan Chase's Staten Island District and held the position until August 2012.  (Def. 56.1 ¶ 18).

### 2. Plaintiff's Performance Evaluations

From at least 2006 through 2011, Plaintiff received annual performance reviews, in addition to a midyear performance review in 2011.  The performance reviews contain several (not always consistent from year to year) categories (e.g., "Leadership," "Operations," and "Staffing") in which Digilov was rated, as well as an overall rating.  (*See* Ginsburg Decl., Ex. 3-9).  The possible ratings from 2006 to 2010 were "Needs Improvement," "Meets Expectations," and "Exceeds Expectations," while in the 2011 midyear and year-end reviews the ratings "Low Meets" and "High Meets" were provided as additional gradations.  (*Id.*).  In addition, the performance reviews included space for comments within categories and subcategories, as well as a space to note overall areas for improvement.  (*Id.*).

The reviews were generally prepared by the branch managers and involved some discussions with the district manager.  (Renner Dep. 39).  In Plaintiff's case, however, there is evidence in the record to suggest Chua may have participated more heavily in the authorship of the midyear and year-end 2011 reviews due to Guinta's and Renner's relative lack of experience with Digilov at those points.  (Pl. 56.1 ¶¶ 41, 45).  Additionally, in the case of the 2011 midyear review, Chua may have prepared it largely independently of Guinta, though it bears Guinta's signature.  (Pl. 56.1 ¶ 41; Ginsburg Decl., Ex. 8).

In each of the five performance reviews covering 2006 through 2010, Plaintiff received an overall rating of Meets Expectations.  (Ginsburg Decl., Ex. 3-7).[2]  The 2006 performance review contained a rating of Exceeds Expectations for one category (Operations), and Meets Expectations for the remaining four categories.  (*Id.*, Ex. 3).  In the 2007 performance review Digilov was given a rating of Meets Expectation in every category.  (*Id.*, Ex. 4).  In 2008, Digilov received a Needs Improvement in P&L (profit and loss) Measurement and a Meets Expectations in the remaining four categories.  (*Id.*, Ex. 5).  In 2009, Digilov received a Needs Improvement in Leadership and a Meets Expectations in the remaining five categories.  (*Id.*, Ex. 6).  And in 2010, Digilov received a Meets Expectations in all five categories.  (*Id.*, Ex. 7).  In each of these years, Digilov was given one or more Areas Doing Well and one or more Areas for Improvement.  (*Id.*, Ex. 3-7).

Digilov's 2011 midyear review, delivered on August 25, 2011 — roughly a month into Guinta's tenure as Plaintiff's supervisor, and shortly after Plaintiff states that he first spoke to Chua about promotion to branch manager (Digilov Decl. ¶ 36) — was substantially more critical (Ginsburg Decl., Ex. 8).[3]  Digilov received an overall performance rating of Needs Improvement, the lowest level.

---

[2]    Plaintiff claims that he received an overall rating of Exceeds Expectations on one of his performance reviews from that time period (*see* Pl. Opp. 16), but this claim is belied by the record.  Each of the performance evaluations clearly gives an overall rating of Meets Expectations, and Plaintiff conceded as much in his Rule 56.1 responses and in his deposition.  (*See* Pl. 56.1 ¶¶ 22, 26, 30, 34, 38; Ginsburg Decl., Ex. 3-7; Digilov Dep. 37-52).

[3]    Neither party explains why Digilov received a midyear performance review, which he had never before received, in 2011 or identifies any significance in its first appearance in that year.

(*Id.*).  He received that rating in three of the five categories, and a rating of Low
Meets in the remaining two categories.  (*Id.*).  Though the 2011 midyear review
did not provide space for comments within categories, it did provide Areas
Doing Well and Areas For Improvement: in the former he received praise for his
work ethic, contribution to the ongoing financial campaign, and maintaining
certain benchmarks; in the latter he was chided for issues with teller
scheduling, failing to provide runners, issues with deliverables, and dual
control issues noted in internal and external evaluations of the branch.  (*Id.*).

Digilov's 2011 year-end review was somewhat improved, giving him an
overall rating of Low Meets Expectations and one rating each of Needs
Improvement, Low Meets, and Meets Expectations within the three categories.
(Ginsburg Decl., Ex. 9).  Positive and negative comments were interspersed
throughout, though the review contained significantly more negative
comments.  (*Id.*).

### 3.  Plaintiff's Other Performance Indicators

Both parties highlight a number of additional indicia of Digilov's
performance at JPMorgan Chase.  Plaintiff points to responsibilities he was
given, including managing the conversion of three Washington Mutual Bank
branches into JPMorgan Chase branches in and around 2008 (Digilov Decl.
¶ 18); performance awards and certificates that he received (*id.* at ¶¶ 14, 20);
and invitations to join a focus group and an internal investigation group (*id.* at
¶¶ 22, 23).  Plaintiff also notes correspondence between and among Chua,
Valentin, himself, and other relevant parties indicating high performance by

Plaintiff and his branches at the time, particularly with regard to his interim management of the Point Pleasant branch in 2011.  (*Id.* at ¶¶ 40, 42).

Both parties draw conflicting conclusions from a series of evaluations of the branches where Plaintiff worked.  Branch Audits were performed in July 2010 and June 2011; though each gave the Amboy Montreal branch an overall rating of "Satisfactory," the highest possible score, each identified areas for improvement that fell within Plaintiff's bailiwick.  (Def. 56.1 ¶¶ 68-75; Pl. 56.1 ¶ 68).  In addition, Field Operations Visits (sometimes referred to as "SWAT visits") were conducted on the Amboy Montreal branch in May 2011, and the Point Pleasant branch in October 2011 and April 2012.  (Def. 56.1 ¶¶ 76-81).  All three of these visits noted certain issues under Plaintiff's control; the first and last gave an overall rating of "Looks Good," the highest possible rating, while the October 2011 visit gave a rating of "Needs Work."  (*Id.*).  Plaintiff points out that at the time of the October 2011 visit he had only been at the Point Pleasant Branch for roughly one month, and argues that the April 2012 visit more accurately reflects the fruits of his seven-month effort to improve the branch.  (Pl. 56.1 ¶ 79).

Defendant points as well to Plaintiff's three Written Warnings, which he received in September 2007, September 2009, and October 2010, prior to his discussions about a promotion with either Valentin or Chua.  (Def. 56.1 ¶¶ 62, 64, 66).  Written Warnings are part of JPMorgan Chase's Corrective Action Policy, which envisions employees receiving notifications of performance issues and a chance to correct the issues before more serious action is taken.  (*Id.* at

¶¶ 52-61).   Under the Corrective Action Policy, a Written Warning is intended to "identify the performance issues, the expected standards of performance or behavior, the consequences of failing to improve sufficiently and a time frame for improvement." (Ginsburg Decl., Ex. 12).   Written Warnings also create a restrictions period of at least two months, "during which time the employee cannot transfer to another position, apply for another position through job posting, receive a promotion, or apply for tuition assistance." (*Id.*).   Plaintiff's three Written Warnings were for, respectively: (i) failure to report a cash difference overage, allowing an armored car driver to carry cash through the bank with customers present in violation of policy, and speaking harshly and disrespectfully to tellers; (ii) errors in recording time records and failures to properly account for and secure cash; and (iii) failure to process a transaction with a teller and then improperly allowing that teller to remove cash from her cash box.  (Def. 56.1 ¶¶ 63, 65, 67).   Plaintiff contests the substance of the 2007 and 2009 Written Warnings, and further disputes that he received coaching and counseling prior to any of the warnings in accordance with Defendant's Corrective Action Policy.  (Digilov Decl. ¶¶ 25-26).   Plaintiff notes as well that he received a performance review of Meets Expectations in each annual review that followed the Written Warnings.  (*Id.* at ¶ 25).

Plaintiff was also put on two Assistant Branch Manager Action Plans. (Def. 56.1 ¶¶ 48-51).   The record suggests that Action Plans are somewhat less severe than a Written Warning; rather than automatically entailing the consequences of a Written Warning, they are designed to put an employee on

8

notice and can, if improvement is not seen, form the basis of a subsequent Written Warning.  (*See* Berenbaum Decl., Ex. 2 at 12-13).  The plans given to Plaintiff were nominally prepared and overseen by his branch managers at the time, and were designed to identify specific areas for improved performance; "[f]ailure to meet the expectations of this plan," each warned, "may result in further corrective action up to and including termination."  (Ginsburg Decl., Ex. 10, 11).

The first performance plan covered the period from April 29, 2011, to July 29, 2011.  (Ginsburg Decl., Ex. 10).  It was issued by Valentin, Plaintiff's branch manager at the time.  (*Id.*).  Valentin, however, states in his affidavit that he was instructed by Chua (his superior, the district manager) to give Digilov a Written Warning in response to a SWAT visit.  (Valentin Decl. ¶ 9).[4] Valentin instead gave Digilov the Action Plan when JPMorgan Chase's Human Resources Department advised him that a Written Warning was not an appropriate response to a SWAT visit.  (*Id.* at ¶ 11).  Valentin states that he "was reluctant to write up Mr. Digilov, not thinking that he deserved to be disciplined," and that "in insisting that Mr. Digilov be disciplined ... Ms. Chua was unfairly targeting him."  (*Id.* at ¶¶ 10, 13).  Notably, this Action Plan was issued within weeks of when Plaintiff states that he spoke to Chua about a promotion to branch manager trainee and his concerns of age discrimination. (Digilov Decl. ¶ 36).

---

[4]      The record is unclear as to what SWAT visit the Action Plan was in response to: the Action Plan was administered on April 29, 2011, two weeks before the May 13, 2011 SWAT visit.  (*Compare* Ginsburg Decl., Ex. 10, *with id.*, Ex. 18).

Plaintiff was put on a second Action Plan — similar, but not identical, to the first — on February 21, 2012, covering the period up to March 21, 2012. (Ginsburg Decl., Ex. 11). Defendant states that the Plan was prepared by Renner (Plaintiff's branch manager at Point Pleasant at the time) along with Guinta (Plaintiff's former branch manager at Amboy Montreal) (Def. 56.1 ¶ 50), while Plaintiff claims that it was the work of Renner and Chua (Pl. 56.1 ¶ 50). Neither account of authorship can be confirmed, since Defendant cites to an unsigned document and Plaintiff cites to portions of deposition transcripts that were not submitted by either party in connection with this motion.

### 4.    Defendant's Process for Promotions to Branch Manager

In order to become a branch manager, an applicant first has to become a branch manager trainee. (Valentin Decl. ¶ 7). The branch manager trainee program involves rotations to different branches, where the trainees gain experience by shadowing branch managers and the district manager. (Guinta Dep. 9-11; Caruso Dep. 23). Importantly, for any promotion at JPMorgan Chase, a candidate must have received a rating of at least Meets Expectations on either their last performance review or their last two performance reviews (*compare* Caruso Dep. 26, *with* Chua Dep. 78); by either standard, Plaintiff became ineligible for promotion upon his receipt of a Needs Improvement rating in his 2011 midyear evaluation.

Plaintiff identifies five employees of JPMorgan Chase who became branch manager trainees in 2011: James Welch (Berenbaum Decl., Ex. 9); Laurie Guinta (*id.*, Ex. 10); Nicholas Lepore (*id.*, Ex. 11); Trudy Bonito (*id.*, Ex. 12);

and Judith Renner (*id.*, Ex. 13).  Each became a branch manager within 12 months of becoming a branch manager trainee.  Their respective ages at the time of their promotions to branch manager trainee were 31, 40, 29, 48, and 45.  Three of the five were relationship bankers at the time of their promotion (Welch, Guinta, and Renner), while the remaining two were, like Digilov, assistant branch managers.  At the time of their promotions, each had received a rating of Exceeds Expectations on their performance evaluation for the most recent year,[5] and all their previous ratings were Meets Expectations or Exceeds Expectations.

JPMorgan Chase had a Job Posting policy in effect during the relevant period.  (Def. 56.1 ¶¶ 96-101).[6]  The policy stated that employees could "find out about open positions that are posted by accessing the Careers website," where available positions inside JPMorgan Chase were posted, and further stated that employees eligible for the posted jobs did not need their current manager's permission to apply.  (*Id.* at ¶¶ 98-100).  Defendant argues that this was the full extent of its promotions policy (*see id.* at ¶ 96 ("The Bank does not have a job promotions policy.  Rather, it has a Job Posting policy.")), including

---

[5]     Plaintiff states that Welch had received a rating of Meets Expectations on the only performance review completed at the time of his promotion to branch manager trainee. (Pl. Opp. 16).  As Welch was promoted on January 16, 2011, and did not receive his 2010 year-end performance review until February 1, 2011, this is technically correct. (*See* Berenbaum Decl., Ex. 9).  However, it is reasonable to think that those responsible for Welch's supervision (presumably including his branch manager, who would complete the review a mere 16 days later) were aware of the performance that would give rise to his rating of Exceeds Expectations for his 2010 year-end performance review.

[6]     There were actually two policies in effect, one from January 2, 2009, to February 15, 2011, and one between February 15, 2011, and August 2012; however, the material provisions of the two policies remained the same.  (Def. 56.1 ¶¶ 97-101).

for branch manager trainee, and Plaintiff was never considered for a promotion for the simple reason that he did not apply through this mechanism (*id.* at ¶¶ 102-04).  Plaintiff, on the other hand, states in his declaration that he "regularly browsed the Chase Career listings section on the Chase intranet site, but [he] *never* saw a Posting for Branch Manager Trainee." (Digilov Decl. ¶ 29 (emphasis in original)).  He also submits evidence suggesting that the Job Posting policy either was not the exclusive mechanism for promotions or was largely a formality after discussions with certain supervisors.  (*See* Pl. 56.1 ¶ 104 (citing Caruso Dep. 23-25 (stating that branch manager trainee candidates would be identified by the branch manager and district manager, and then "at a certain time" be told to post for a position); Valentin Decl. ¶ 7 (stating that "only a D[istrict] M[anager], like Ms. Chua, had the authority to nominate an employee to become a B[ranch] M[anager] T[rainee].")).

JPMorgan Chase contradicts Plaintiff's statement about the posting of branch manager trainee positions on the internal website by submitting a declaration in support of its reply brief from Marta Santiago, Vice President and Recruiting Manager of JPMorgan Chase.  (Santiago Decl. ¶ 1).[7]  Attached as exhibits are printouts of branch manager trainee requisition reports, showing a list of all branch manager trainee positions in the Northeast region for 2011 and 2012 that were filled (*id.*, Ex. 1), and that were cancelled before being filled

---

[7]     Plaintiff moved to strike the material or in the alternative to file a sur-reply.  The Court denied Plaintiff's motion to strike or to file a sur-reply (Dkt. #57), finding then as it does now (*see* Discussion § B.1.b, *infra*) that the presence of branch manager trainee posts on JPMorgan Chase's internal website does not alter the outcome of this motion.

(*id.*, Ex. 2).  Santiago declares that "[a]ll of the Branch Manager Trainee requisitions were posted on the Bank's Job Connect system" (*id.* at ¶ 6), except for a small number that were "cancelled almost immediately after being approved" (*id.* at ¶ 8).  Santiago acknowledges that "some requisitions were approved and filled the same day or within three (3) days of approval, generally when a candidate already had been selected before a requisition had been approved." (*Id.* at ¶ 7).  Neither the declaration nor the spreadsheets make clear whether the positions filled by Welch, Guinta, Lepore, Bonito, and Renner were filled through the latter mechanism after they had already been selected.

## 5.  Plaintiff's Discussions About a Potential Promotion and Complaints of Discrimination

Plaintiff states that Autrum, his district manager before Chua, told him that she had suggested his promotion to branch manager trainee.  (Digilov Decl. ¶ 27).  Following Autrum's retirement, Digilov then spoke to Valentin, his branch manager, about a promotion.  (*Id.* at ¶¶ 30-31).[8]  He was 57 years old at this point.  Valentin states that around February 2011 he submitted to Chua a development plan to prepare Digilov for a position as branch manager, and spoke to her as well about promoting Digilov to a branch manager trainee. (Valentin Decl. ¶¶ 6-7).  Another office at JPMorgan Chase forwarded the development plan to Chua, noting Digilov's experience of five and a half years as an assistant branch manager at JPMorgan Chase and experience in the

---

[8]     It is unclear whether Autrum retired in early 2010, as suggested by Defendant's Rule 56.1 Statement with Plaintiff's agreement (*see* Def. 56.1 ¶¶ 18-19; Pl. 56.1 ¶¶ 18-19), or in November 2010, as stated by Plaintiff (Digilov Decl. ¶ 27).  The discrepancy is not material to the outcome of the motion.

same position prior to that at Commerce Bank, and asked Chua "to speak to him and see if he is a good fit." (Berenbaum Decl., Ex. 2 at 10). Neither Valentin nor Digilov received any response from Chua to these first efforts. (Valentin Decl. ¶ 8; Digilov Decl. ¶ 32).

After seeing that Lapore and Guinta had been placed into the branch manager trainee program, Plaintiff complained to Valentin that he "suspected that [he] had not been approved for the Branch Manager Trainee program because Ms. Chua thought [he] was too old." (Digilov Decl. ¶¶ 33-35). Plaintiff also spoke to Chua in mid-April 2011 about the branch manager trainee program. (*Id.* at ¶ 36). Digilov states that he again complained about the possibility of age discrimination (*id.*), while Chua denies that she and Digilov ever spoke about age discrimination in their conversations about his desire to become a branch manager (Chua Dep. 109-10). According to Digilov, Chua denied that age discrimination was a factor and mentioned that she would like to see improving numbers on the Amboy Montreal branch's second-quarter customer campaign, as well as a Satisfactory rating on its next audit. (Digilov Decl. ¶ 36). Chua denies indicating to Plaintiff that any specific performance metric would result in promotion to branch manager trainee, but acknowledges that the customer campaign and the audit may have come up in their conversions, along with proper sales techniques. (Chua Dep. 41-46, 110-11).

After Amboy Montreal attained 102% of the goal on its customer campaign and received a rating of Satisfactory on the July 2011 audit, Digilov emailed Chua to ask if she felt that it would be "the right time for [Digilov] to

revisit B[ranch] M[anager] opportunity with Chase." (Digilov Decl., Ex. 12-14). Chua did not respond. (*Id.* at ¶ 45). Digilov also states that he spoke to Frank Cortese, a recruiter for JPMorgan Chase, in July 2011 to complain about age discrimination, and that Cortese agreed it was a concern (Digilov Dep. 195-96); Cortese, however, denies that there was any such discussion of discrimination in their conversations (Cortese Dep. 10).

After receiving a rating of Needs Improvement on his 2011 midyear evaluation, Plaintiff spoke to James Caruso, a market manager at JPMorgan and Chua's immediate superior. (Digilov Decl. ¶ 46). Digilov states that, during their conversation on September 12, 2011, Caruso dismissed his complaints of age discrimination. (*Id.* at ¶ 49). In February 2012, Plaintiff spoke once more to Chua about his application to become a branch manager trainee and his concerns over age discrimination, and was told that "it won't work out this year for sure." (*Id.* at ¶ 50).

### 6. The Deterioration of the Relationship Between Plaintiff and Defendant

Evidence in the record suggests that soon after Digilov first spoke directly to Chua about entering the branch manager trainee program, his relationship with JPMorgan markedly declined. Although Digilov had received three Written Warnings prior to 2011, he received his first Action Plan in April 2011, only weeks after speaking to Chua, at her direct prompting. (Ginsburg Decl., Ex. 10; Valentin Decl. ¶¶ 9-13). Plaintiff also received his first performance evaluation with a rating less than Meets Expectations on August

15

25, 2011, an evaluation that Chua at least contributed to.  (*See* Pl. 56.1 ¶ 41).[9]

Shortly thereafter, Plaintiff was transferred temporarily, and then permanently,

to the Pleasant Plains branch. According to Defendant, this move transpired "in

order to give [Plaintiff] an opportunity to demonstrate that he was ready for the

Branch Manager trainee program" (Def. 56.1 ¶ 87); this statement is curious,

to say the least, inasmuch as Plaintiff's negative performance evaluation should

have foreclosed the possibility of his entering such a program.

Digilov's transfer did not improve matters between him and JPMorgan

Chase.  Plaintiff received a second subpar performance review — a Low

Meets — in February 2012, along with an accompanying second Action Plan.

(Digilov Decl. ¶ 63).  In addition, Chua and Renner (then his branch manager)

confronted Plaintiff about a failure to review customer signature cards in a

timely manner in November 2011.  (Def. 56.1 ¶ 88).  A more serious incident

occurred in late February 2012, when Plaintiff failed to record properly a

transaction with another teller.  (*Id.* at ¶¶ 89-93).  Despite having a $500

overage as a result of the transaction, Plaintiff recorded his cash box as

balanced, a serious violation known as a "false proof."  (*Id.*).  The discrepancy

was resolved after a cash count identified the extra money in Plaintiff's cash

box, a count that Plaintiff contends took place at his suggestion.  (*Id.* at ¶ 92;

---

[9]     On April 26, 2011, Chua received an email from Gladys David (Plaintiff's former
manager) referencing a prior conversation and providing a list of 15 bullet points of
negative feedback.  (Berenbaum Decl., Ex. 2 at 14-17).  Chua forwarded this email to
Guinta, Plaintiff's branch manager at the time, shortly before Plaintiff received his 2011
midyear review.  (*Id.*).  Chua also sent an email in August 2011 stating that she was
working on Plaintiff's review.  (Chua Dep. 145-47).  Guinta, meanwhile, could not recall
whether or not she worked on the review at all.  (Guinta Dep. 58-59).

Pl. 56.1 ¶ 92).  The next day Renner found an internal cash audit sheet reporting the differential that she believed Plaintiff had falsified, including by placing her signature on it.  (Def. 56.1 ¶ 93).  During a subsequent vacation by Plaintiff, Renner conducted a cash count of his cash box to see if any money was missing.  (Digilov Decl. ¶ 67).

Plaintiff states that by May 2012 he had been diagnosed with diabetes attributed by his doctor to the stress of work, had lost significant weight, and was receiving psychiatric treatment.  (Digilov Decl. ¶¶ 64-65).  Plaintiff states that when he returned to work after taking several days off following a cardiogram revealing elevated stress, Renner mocked him by calling him over-medicated, suggesting that he was going through menopause, and asking him if he was smoking marijuana.  (*Id.* at ¶ 71).  On May 21, 2012, Digilov was ordered to report to JPMorgan Chase's Global Security and Investigations Department to discuss the February 2012 transaction and documentation issues.  (Def. 56.1 ¶ 94).  While driving into Manhattan, Plaintiff fell ill and rushed to the hospital with chest pains.  (Digilov Decl. ¶ 76).  Plaintiff went on disability leave shortly thereafter and has not since returned to work.  (*Id.* at ¶ 77).

## B.   Procedural Background

Plaintiff initiated this action on February 13, 2013, alleging employment discrimination and retaliation on the basis of age in violation of the ADEA, the NYSHRL, and the NYCHRL.  (Complaint ("Compl.") ¶ 1 (Dkt. #1)).  After the conclusion of discovery, Defendant filed its motion for summary judgment on

May 12, 2014.  (Dkt. #29).  Plaintiff filed his opposition on June 12, 2014 (Dkt. #41), and the briefing was complete upon the filing of Defendant's reply brief on July 3, 2014 (Dkt. #53).[10]  The Court now considers Defendant's motion.

## DISCUSSION

### A.   Applicable Law

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the

---

[10]     As noted above, Plaintiff moved on July 18, 2014, to strike an exhibit to the reply brief or to file a sur-reply.  (Dkt. #54).  The Court denied the motion.  (Dkt. #57).

non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials … cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where … the merits turn on a dispute as to the employer's intent." *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (internal quotation marks omitted). "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully

19

scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp* v. *Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (internal quotation marks omitted); *see also Holcomb* v. *Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008) ("Where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." (internal quotation marks omitted)). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than 'some metaphysical doubt as to the material facts.'" *Gorzynski*, 596 F.3d at 101 (quoting *Matsushita*, 475 U.S. at 586) (internal citation omitted).

**B.   Analysis**

> **1.   Defendant Is Not Entitled to Summary Judgment on Plaintiff's Discriminatory Failure to Promote Claim**

>> **a.   Discriminatory Failure to Promote Claims Under the ADEA, the NYSHRL, and the NYCHRL**

Plaintiff brings claims for both discrimination (in the form of a failure to promote) and retaliation; the Court will address each in turn. Under the ADEA, it is "unlawful for an employer to ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, under the NYSHRL, it is "an unlawful discriminatory practice [f]or an employer or licensing agency, because of an individual's age,... to discriminate

against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). And under the NYCHRL, it is "an unlawful discriminatory practice [f]or an employer or an employee or agent thereof, because of the actual or perceived age … of any person,… to discriminate against any such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). The NYCHRL was once thought "to be coextensive with its federal and state counterparts," but the Second Circuit has recognized that the New York City Council mandated a more liberal interpretation when it "amended the NYCHRL by passing the Local Civil Rights Restoration Act of 2005 (the 'Restoration Act'), N.Y.C. Local L. No. 85." *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108-09 (2d Cir. 2013). Accordingly, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims," though "summary judgment still can be an appropriate mechanism for resolving NYCHRL claims." *Id.* at 111.

Although the Supreme Court has declined to endorse definitively the application of the burden-shifting framework of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), to ADEA claims, *see Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009), courts within the Second Circuit "remain bound by … the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit." *Gorzynski*, 596 F.3d at 106 (citing *D'Cunha* v. *Genovese/Eckerd Corp.,* 479 F.3d 193, 195 (2d Cir. 2007)). It is well established that the same standard pertains to discrimination claims,

including for age, brought under the NYSHRL.  *See Abdu-Brisson* v. *Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  While "[i]t is unclear whether, and to what extent, the *McDonnell Douglas* burden-shifting analysis has been modified for NYCHRL claims," *Mihalik*, 715 F.3d at 110 n.8, "[c]ourts have continued to employ the familiar burden-shifting analysis of *McDonnell Douglas* to claims brought under the NYCHRL," *Richardson* v. *Bronx Lebanon Hosp.*, No. 11 Civ. 9095 (KPF), 2014 WL 4386731, at *10 (S.D.N.Y. Sept. 5, 2014) (internal quotation marks omitted).  The critical difference, as discussed *infra*, is the degree of causation that a plaintiff must demonstrate at the third step.

Under the *McDonnell Douglas* framework,

> the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action.  Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination.

*Gorzynski*, 596 F.3d at 106 (internal citations omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802).  The third step in this analysis is sometimes characterized as requiring the plaintiff to show that the defendant's nondiscriminatory justification is a "pretext," *see Zann Kwan* v. *Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013), but ultimately is a question of the true cause of the employer's actions.  *See generally Delaney* v. *Bank of Am. Corp.*, 766 F.3d 163, 168 (2d Cir. 2014) ("Since the Supreme Court's decision in [*Gross*], eliminating the mixed-motive analysis as to ADEA claims, a plaintiff bringing a disparate-treatment claim pursuant to the ADEA satisfies this

burden by presenting facts, which taken in [his] favor, suffice to ... [show that]

a triable issue [exists] as to whether [his] age was a 'but for' cause of [his]

termination." (internal quotation marks and citation omitted)).

The Supreme Court has determined that "under § 623(a)(1) [of the

ADEA], the plaintiff retains the burden of persuasion to establish that age was

the 'but-for' cause of the employer's adverse action," rather than merely a

contributing factor. *Gross*, 557 U.S. at 176, 177. Whether that same

heightened standard applies to the NYSHRL remains an open question within

the Second Circuit, *see, e.g.*, *McGarty* v. *City of New York*, No. 12 Civ. 2813

(NRB), 2014 WL 4626019, at *17 (S.D.N.Y. Sept. 16, 2014), though that Court

has "assume[d], without deciding, that the Supreme Court's *Gross* decision

affects the scope of the NY[S]HRL law as well as the ADEA," *Gorzynski*, 596

F.3d at 106. In contrast, it is clear that under the NYCHRL,

> the plaintiff need only show that her employer treated
> her less well, at least in part for a discriminatory reason.
> The employer may present evidence of its legitimate,
> non-discriminatory motives to show the conduct was
> not caused by discrimination, but it is entitled to
> summary judgment on this basis only if the record
> establishes as a matter of law that "discrimination
> play[ed] *no* role" in its actions.

*Mihalik*, 715 F.3d at 110 (alteration and emphasis in original) (quoting *Williams*

v. *N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n.27 (1st Dep't 2009));

### b. Plaintiff Has Made Out a Prima Facie Case of Discriminatory Failure to Promote

To establish a prima facie case of discriminatory failure to promote,

Plaintiff must demonstrate by a preponderance of the evidence that: "[i] [he] is

a member of a protected class; [ii] [he] applied and was qualified for a job for
which the employer was seeking applicants; [iii] [he] was rejected for the
position; and [iv] the position remained open and the employer continued to see
applicants having the plaintiff's qualifications." *Mullinix* v. *Mount Sinai Sch. of
Med.*, No. 12 Civ. 8659 (PKC), 2014 WL 3687217, at *14 (S.D.N.Y. July 24,
2014) (quoting *Petrosino* v. *Bell Atl. Corp.*, 385 F.3d 210, 226 (2d Cir. 2004)).
The only element of Plaintiff's prima facie case contested by Defendant is
whether he actually applied for the branch manager or branch manager trainee
position, and the Court finds that Plaintiff has met his burden with regard to
the undisputed elements.

The parties dispute whether Plaintiff sufficiently applied for the branch
manager or branch manager trainee by speaking to his branch manager
(Valentin) and his two district managers (Autrum and Chua), or whether
posting for a job opening on Chase's internal website was a necessary first
step.  In large part this dispute turns on the proper application of the Second
Circuit's "specific application" rule.  The rule states that a specific application
for a desired position is required, and that "the second element of a *prima facie*
case cannot be established merely with evidence that a plaintiff generally
requested promotion consideration."  *Petrosino*, 385 F.3d at 227 (citing *Brown*
v. *Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998)).  The *Brown* Court
recognized "that 'the facts of a particular case' may sometimes make 'a specific
application a quixotic requirement,'" *id.* (quoting *Brown*, 163 F.3d at 710), but
the *Petrosino* Court reaffirmed that "the exception [to the specific application

24

requirement] is narrow," requiring an employee to "demonstrate that [i] the vacancy at issue was not posted, and [ii] the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.*

There is some tension among Second Circuit precedents on the specific application rule regarding the extent to which a *formal* application — and not merely a specific-but-informal one — is required. *Compare Williams* v. *R.H. Donnelley, Corp.*, 368 F.3d 123, 129 (2d Cir. 2004) ("[W]e have held that if an employee expresses to the employer an interest in promotion to a particular class of positions, that general expression of interest may satisfy the requirement that the employee apply for the position."), *with Petrosino*, 385 F.3d at 227 ("[T]he exception [to the specific application rule] is narrow and does not pertain simply because an employee asserts that an 'aura of discrimination' in the workplace somehow discouraged her from filing a formal application."). Yet even assuming that a specific application must be a formal one, the record indicates that Plaintiff is entitled, at least at this stage of the litigation, to the exception to the specific application requirement recognized in *Petrosino*.

The Court, construing the evidence in the light most favorable to Plaintiff, finds that the specific positions at issue may not have been posted, thus satisfying the first prong of the specific application exception. In *Petrosino*, which arose in a similar procedural context, the Court assumed "[i] that many employees … could not reasonably have known about all

available positions through the company's posting policy; [ii] that employees often applied for jobs, at least in the first instance, by speaking informally with supervisors; and [iii] that ... managers often groomed favored candidates for specific managerial positions."  385 F.3d at 227.  Under such circumstances, the Court found that "these facts may satisfy the first prong of the specific application exception."  *Id.*  The evidence in the record certainly establishes that the second and third features identified in *Petrosino* — the presence of informal channels and the grooming of candidates for specific positions — are present here.

The primary question is whether Digilov reasonably could have known about all available branch manager trainee positions through JPMorgan Chase's Job Posting policy.  Even accepting the evidence submitted with Defendant's reply brief (and not previously produced in discovery), the record suggests that most of the branch manager trainees actually selected in the Brooklyn/Staten Island region were selected before their formal postings, which were theoretically available for less than a day.  While JPMorgan Chase does not provide the names of the branch manager trainees selected through each filled posting, the hiring date of only one of the five branch manager trainees identified as having been promoted in 2011 can be linked to a posting available for longer than a single day.  Welch was promoted to branch manager trainee on January 16, 2011 (Berenbaum Decl., Ex. 9), appearing to correspond to a series of branch manager trainee postings that were approved and filled the same day on January 13, 2011 (Santiago Decl., Ex. 1).  Guinta

and Lepore were both promoted to branch manager trainee on March 16, 2011 (Berenbaum Decl., Ex. 10, 11); on March 21, 2011, a single posting was filled that had been open since February 8, 2011, while on March 23, 2011, three postings were approved and filled on the same day (Santiago Decl., Ex. 1). Thus, if Guinta and Lepore filled posted positions, at least one of the postings was available for only a single day. Bonito was promoted to branch manager trainee on December 1, 2011 (Berenbaum Decl., Ex. 12), corresponding to a posting approved on November 2, 2011, and filled on November 29, 2011 (Santiago Decl., Ex. 1). And Renner was promoted to branch manager trainee on May 1, 2011 (Berenbaum Decl., Ex. 13), which does not correspond to any filled posting on JPMorgan Chase's internal website. Thus, of the five people actually identified as having been promoted to branch manager trainee in 2011, only Bonito's position appears to have been posted for longer than a single day. Furthermore, Chua stated in her deposition that she selected Bonito "[j]ust me myself" (Chua Dep. 92), along with Welch and Renner, suggesting that even Bonito was not selected by applying to a posted vacancy *sua sponte*.

Construing the evidence in Plaintiff's favor, the Court thus finds that Digilov could not have been expected to know about most, if not all, of the postings that resulted in branch manager trainee selections; that most, if not all, promotions were filled through informal means; and that managers such as Chua often groomed preferred candidates for specific positions. Following the *Petrosino* Court's guidance, the Court thus finds that the first prong of the

27

specific application exemption is met.  Digilov meets the second prong, meanwhile, by having made an informal application for the position of branch manager trainee: both Digilov and Valentin made repeated efforts to have Digilov considered for branch manager trainee, efforts that either went ignored or were specifically rebuffed by Chua.

The instant case is thus distinguishable from *Brown*, where, despite inconsistent posting practices, the plaintiff failed on the second prong: "[t]here [was] no allegation in the complaint that Brown was not aware of positions, posted or not, as they came open," and the plaintiff became disheartened and did not attempt to apply to those specific positions through any means. *Brown*, 163 F.3d at 710.  Here, Plaintiff made assiduous informal efforts to apply to become a branch manager trainee, a position that was filled largely through informal means.  Accordingly, Plaintiff has established a prima facie case of discriminatory failure to promote.

### c.   Defendant Has Established a Nondiscriminatory Justification for Its Failure to Promote Plaintiff

Because Plaintiff has made out a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. Defendant identifies a simple reason for its failure to promote Plaintiff to branch manager trainee: he was no more than an adequate manager and thus, while qualified in a technical sense, judged not to be ready for promotion.  (Def. Br. 16).  The record evidence supports this explanation: Plaintiff had received an evaluation of Meets Expectations on every performance review up to his first

28

conversation with Chua about a promotion,[11] while the five successful candidates for branch manager trainee identified by Plaintiff had received an evaluation of Exceeds Expectations on their most recent (or in Welch's case, the immediately forthcoming) evaluation.[12]

Courts have repeatedly found explanations that rejected candidates were less qualified than accepted ones to be legitimate justifications. *See, e.g.*, *Houston* v. *Manheim-N.Y.*, 475 F. App'x 776, 779 (2d Cir. 2012) (summary order) (upholding summary judgment where Plaintiff failed to provide evidence "that demonstrated defendants' discriminatory intent or rebutted their legitimate, nondiscriminatory reason for rejecting [plaintiff] for the position, namely, that they hired a more qualified individual"); *Moore* v. *Metro. Transp. Auth.*, 999 F. Supp. 2d 482, 495 (S.D.N.Y. 2013) ("Defendants have articulated a legitimate, nondiscriminatory reason for not promoting him. Namely, Defendants argue that Plaintiff was less qualified than those officers promoted[.]"). And the Second Circuit has endorsed the use of performance reviews as a legitimate, nondiscriminatory explanation: where such "explanations are 'reasonably attributable to an honest even though partially subjective evaluation of ... qualifications, no inference of discrimination can be

---

[11]    As noted *supra*, Plaintiff is simply incorrect in asserting that he had received an evaluation of Exceeds Expectations.

[12]    Plaintiff points out with regard to Welch that Chua had testified that at least two years of evaluations of at least Meets Expectations were required for promotion to branch manager trainee. (Pl. Opp. 16 (citing Chua Dep. 77-78)). It is unclear, however, whether the requirement was two years of satisfactory reviews, as Chua suggested, or one year, as her supervisor Caruso suggested. (Caruso Dep. 26). Furthermore, as discussed *supra* at note 5, it is reasonable to assume that Welch's branch manager and his district manager were aware of his forthcoming positive evaluation.

drawn.'" *Diello* v. *Potter*, 413 F. App'x 344, 346 (2d Cir. 2011) (summary order) (alteration in original) (quoting *Byrnie* v. *Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 105 (2d Cir. 2001)).  Although Plaintiff attacks the credibility of the 2011 midyear and year-end evaluations that gave him ratings of Needs Improvement and Low Meets, characterizing them as retaliatory, he does not contest the overall fairness of the five reviews preceding his attempt at a promotion, which are on the whole inferior to those of the five successful candidates identified.[13]

Plaintiff additionally argues that whatever his performance reviews, his experience made him more qualified than those promoted ahead of him: he was an assistant branch manager for over five years, while three of the five other candidates promoted to branch manager trainee were only personal bankers (the other two were assistant branch managers as well).  Plaintiff cites to some of the desirable attributes of a branch manager position listed by Chua centering around operations, and states that "[a] personal banker's job duties are unrelated to the operational responsibilities listed by Chua." (Pl. Opp. 19).[14]  This assertion is somewhat misleading.  The evidence suggests that the branch manager's responsibilities encompass both sales and operations, while the assistant branch manager focuses primarily on

---

[13]   The Court notes as well the three Written Warnings received by Plaintiff in 2007, 2009, and 2010, but accords these less weight for two reasons.  First, the record provides no context from which to determine the gravity of such warnings or their frequency within the pool of applicants.  And second, Plaintiff's satisfactory performance reviews in each of these years indicate that Written Warnings are not considered an indelible black mark on an employee's record.

[14]   The record cites included by Plaintiff in support of this argument either are omitted from the materials submitted to the Court or do not support the argument.

operations.  (Def. 56.1 ¶¶ 10-11).  Plaintiff fails to demonstrate that personal bankers lack other experience — such as in sales — relevant to the position of branch manager.  Although "[c]ourts have recognized that an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision," *Byrnie*, 243 F.3d at 103, the decision to promote personal bankers in addition to assistant branch managers appears to be a systematic one rather than an implausible miscalculation.  The Court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments."  *Id.* (quoting *Simms* v. *Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999)) (internal quotation marks omitted).  Accordingly, it cannot dispute the validity of Defendant's proffered justification.

> ### d.   Plaintiff Has Demonstrated a Material Issue of Fact as to Whether Defendant's Explanation Is Pretextual

Because Defendant has shown a legitimate, nondiscriminatory reason for not promoting Plaintiff, the burden shifts back to Plaintiff to "show that the employer's determination was in fact the result of discrimination."  *Gorzynski*, 596 F.3d at 106.  As noted *supra*, under the ADEA the employee must show that discrimination was not merely a partial motivating factor, but a but-for cause of the determination, *Gross*, 557 U.S. at 176, 177, while under the NYCHRL (and possibly the NYSHRL) the burden is lower, *Mihalik*, 715 F.3d at 110 n.8.  "However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action

would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 846.  Plaintiff successfully meets the burden set forth under the ADEA, and, as the greater includes the lesser, Defendant is not entitled to summary judgment on the failure to promote claim under any of the three bodies of law at issue.

As noted, Defendant met its burden to demonstrate a legitimate, nondiscriminatory justification for its decision, namely that Plaintiff's performance reviews suggested he was less qualified.  Had Chua and JPMorgan Chase consistently offered this explanation, the inquiry would end here. Unfortunately, they did not.  At their first meeting to discuss a possible promotion, Chua — who seemingly ignored earlier communications from Valentin and Chase's Human Resources Department about Digilov — told Digilov that she was concerned about some past comments on audits, the results of an ongoing customer campaign, and the manner in which sales were carried out.  Although what precisely was discussed at this meeting is disputed between Digilov and Chua, neither suggests that his performance reviews were discussed in either a comparative or absolute sense.  By July 2011, Digilov had satisfied what he believed were the concrete goals set out by Chua, with the Amboy Montreal branch achieving a Satisfactory rating on its audit and attaining 102% of its customer campaign goal.  Caruso and Chua, respectively, sent messages to Digilov personally and the Amboy Montreal branch as a whole congratulating them for these results.  (Digilov Decl., Ex. 12, 13).  Nevertheless, Chua did not respond to Digilov's renewed email request for consideration for

promotion to assistant branch manager.  And Defendant's legal arguments make limited mention of audits and none of the customer campaign, focusing more heavily on performance evaluations, Written Warnings, and Action Plans. Courts have denied summary judgment where a defendant "offered shifting and somewhat inconsistent explanations" for an adverse action.  *Zann Kwan*, 737 F.3d at 846; *accord E.E.O.C.* v. *Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (finding a "'legally sufficient evidentiary basis' from which a reasonable jury could have found that [defendant] dismissed [plaintiff] because of his age" where the defendant "introduced evidence suggesting that [defendant] provided inconsistent explanations for its decision to terminate [plaintiff]").

Equally suggestive is evidence indicating that, immediately following Plaintiff's request for a promotion, Chua began attempting to bolster her reasons for not promoting him.  Within a month of Digilov's meeting with her, there is evidence that Chua pressured his branch manager Valentin into giving Plaintiff his first Action Plan.  (Valentin Decl. ¶¶ 9-13).  She also heavily participated in the sharply negative performance review given to Plaintiff in August 2011, including by acquiring negative feedback on Plaintiff from his former branch manager, David, and forwarding them to his current branch manager, Guinta.  (Berenbaum Decl., Ex. 2 at 14-17).  Defendant relies in its brief upon Plaintiff's performance evaluations and Action Plans (Def. Br. 16), yet all of his negative performance reviews and both of his Action Plans were given with Chua's involvement after Digilov had already repeatedly requested promotion to branch manager trainee.  Courts have denied summary judgment

where "[a] jury could find that [evidence] supports an inference that the [defendant] intentionally created a negative record about Plaintiff in anticipation of litigation." *Collins* v. *Cohen Pontani Lieberman & Pavane*, No. 04 Civ. 8983 (KMW)(MHD), 2008 WL 2971668, at *11 (S.D.N.Y. July 31, 2008).

While Plaintiff has brought forward scant direct evidence that JPMorgan Chase refused to promote him on the basis of age — largely limited to (i) a comparison of his age to the ages of those promoted in his stead and (ii) a single comment from Renner in May 2012 accusing him of "going through 'menopause'" (Digilov Decl. ¶ 71) — Defendant's inconsistent justifications for his denial of promotion are sufficient to permit a jury to find that Defendant's shifting explanations are pretexts designed to conceal an illicit motive, and that Chua's post-hoc impairment of Plaintiff's employment record served the same ends.  Furthermore, while Plaintiff would be hard-pressed to establish that he would have been promoted over any of the specific branch manager trainees identified, given their arguably superior credentials, his burden is lessened by the fact that there were not a fixed, finite number of branch manager trainee positions.  (Caruso Dep. 25-26).  *See Collins*, 2008 WL 2971668, at *13 ("Defendant does not allege that CPLP had only a fixed number of partner positions available for associates seeking promotion.").  Had Defendant forthrightly and consistently identified Plaintiff's Written Warnings or performance evaluations as the reason for denying him a promotion, the case for summary judgment would have been stronger.  However, given Defendant's inconsistent justifications and Chua's actions after Plaintiff's request for an

interview, there is sufficient (although, to be clear, far from overwhelming) evidence to permit a jury to find that Plaintiff would have been made a branch manager trainee but for his age.

### 2. Defendant Is Not Entitled to Summary Judgment on Plaintiff's Retaliation Claim

#### a. Retaliation Claims Under the ADEA, the NYSHRL, and the NYCHRL

The ADEA, the NYSHRL, and the NYCHRL prohibit retaliation against employees for opposing employment practices that unlawfully discriminate on the basis of age.  *See* 29 U.S.C. § 623(d) (ADEA); N.Y. Exec. Law § 296(1)(e) (NYSHRL); N.Y.C. Admin. Code § 8-107(7) (NYCHRL).  The analysis of retaliation claims under the three statutes proceeds along much the same lines as those outlined for discriminatory failure to promote claims.  To establish a prima facie case of retaliation under the ADEA, "a plaintiff must show '[i] participation in a protected activity; [ii] that the defendant knew of the protected activity; [iii] an adverse employment action; and [iv] a causal connection between the protected activity and the adverse employment action.'" *Bucalo* v. *Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (quoting *Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Courts apply the *McDonnell Douglas* framework to all three analyses, *see Seabrook* v. *N.Y.C. Health & Hospitals Corp.*, No. 13 Civ. 4164 (NRB), 2015 WL 273652, at *8-10 (S.D.N.Y. Jan. 20, 2015), though the plaintiff's burden is reduced under the NYCHRL at the first and final steps.  At the first step, retaliation claims under the NYCHRL cover a broader range of conduct,

requiring only that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in" action to oppose an employer's discrimination.  *Mihalik*, 517 F.3d at 112; *see also Malena* v. *Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012) ("The NYCHRL is slightly more solicitous of retaliation claims than federal and state law because, rather than requiring a plaintiff to show an 'adverse employment action,' it only requires him to show that something happened that was 'reasonably likely to deter a person from engaging in protected activity.'" (internal quotation marks and citations omitted)).  At the final step, "[w]hile the *McDonnell Douglas* burden-shifting framework still applies,... the plaintiff has a 'lesser burden of raising an issue as to whether the action was motivated at least in part by discrimination or, stated otherwise, was more likely than not based in whole or in part on discrimination.'"  *White* v. *Pacifica Found.*, 973 F. Supp. 2d 363, 379 (S.D.N.Y. 2013) (quoting *Melman* v. *Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 42 (1st Dep't 2012)).

### b.    Plaintiff Has Made Out a Prima Facie Case of Retaliation

Defendant contests two of the elements of a prima facie case: whether Defendant had knowledge of the protected activity (Plaintiff's complaint of age discrimination), and whether Plaintiff suffered an adverse employment action. On both, Plaintiff has presented sufficient evidence to withstand a motion for summary judgment.

Plaintiff has adequately established Defendant's knowledge of his protected activity.  Defendant's argument is simply that there is no evidence of

Plaintiff's complaints of age discrimination — unquestionably protected activity, *see Crawford* v. *Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." (internal alterations and quotation marks omitted)) — beyond his "his own self-serving and unsupported allegation." (Def. Br. 20). Yet Plaintiff's declaration is appropriate evidence in opposition to a motion for summary judgment, *see* Fed. R. Civ. P. 56(c)(1)(A), so long as it is made upon personal knowledge, *see* Fed. R. Civ. P. 56(c)(4), and does not contradict either the pleadings or testimony given during the declarant's deposition, *see Mack* v. *United States*, 814 F.2d 120, 124-25 (2d Cir. 1987). Here, Plaintiff makes precisely the same allegations of complaints to Valentin (his branch manager and immediate superior), Chua (his district manager and Valentin's superior), and Caruso (his market manager and Chua's superior) in his Complaint (*see* Compl. ¶¶ 17, 18, 29, 38), his deposition (*see* Digilov Dep. 188-99), and his declaration (*see* Digilov Decl. ¶¶ 35, 36, 49, 50). Though Chua and Caruso deny that he raised allegations of age discrimination, "[c]redibility determinations … are jury functions, not those of a judge, [when] ruling on a motion for summary judgment[.]" *Anderson*, 477 U.S. at 255.

Defendant further argues that Plaintiff did not suffer an adverse employment action. (Def. Br. 20-21). Yet even if Defendant's decision not to promote Plaintiff could not be causally connected to his complaints of age

discrimination, the Second Circuit has held that "actions such as negative employment evaluation letters may … be considered adverse." *Treglia* v. *Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002). "[W]hether they do is typically a question of fact for the jury," *Lawrence* v. *Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary order), though courts require some showing that the negative evaluations had a deleterious effect on the terms and conditions of a plaintiff's employment, *Sanders* v. *N.Y.C. Human Res. Admin.*, 361 F.3d 749, 756 (2d Cir. 2004). *Accord Brown* v. *City of New York*, No. 14 Civ. 2668 (PAE), 2014 WL 5394962, at *8 (S.D.N.Y. Oct. 23, 2014). Such a requirement is easily met here, as Chua and Caruso both acknowledge that a performance evaluation of Needs Improvement, such as the one Plaintiff received shortly after complaining of age discrimination to Chua, renders one ineligible for promotion for at least one year. (*See* Caruso Dep. 26; Chua Dep. 78). *See Trachtenberg* v. *Dep't of Educ. of City of N.Y.*, 937 F. Supp. 2d 460, 470 (S.D.N.Y. 2013) (finding that negative performance evaluations constituted adverse action where they rendered plaintiff ineligible for certain work opportunities and a transfer); *Turner* v. *St. Dominic's Home*, No. 12 Civ. 2648 (PAC)(KNF), 2013 WL 139562, at *3 (S.D.N.Y. Jan. 11, 2013) ("[N]egative evaluations may qualify as adverse employment actions, so long as they affect ultimate employment decisions such as promotions." (internal quotation marks, citations, and alterations omitted)). In addition, the Action Plan given to Plaintiff at Chua's behest within weeks of his complaint may also constitute a form of probation sufficient to qualify as a materially adverse employment

action.  Because the facts, with inferences drawn in Plaintiff's favor, demonstrate that JPMorgan Chase and Plaintiff's direct superiors were aware of his protected status when they gave him negative evaluations that rendered him ineligible for a promotion, the Court finds that Plaintiff has made out a prima facie case of retaliation in violation of the ADEA, the NYSHRL, and the NYCHRL.

> **c.    Even If Defendant Could Establish a Nondiscriminatory Justification for Its Negative Evaluations of Plaintiff, There Are Genuine Issues of Material Fact as to Whether Such Evaluations Were Motivated by Retaliatory Intent**

With regard to retaliation, Defendant places all of its eggs in one basket, declining to proffer a nondiscriminatory justification for Plaintiff's negative performance reviews.  Yet even were the Court to decide that such a justification exists, there is enough evidence in the record for a jury to infer retaliatory intent.  Within days of Digilov's complaint to Chua, she (i) reached out to Digilov's former branch manager to obtain a bullet-point list of negative attributes and (ii) directed his current branch manager to reprimand him (initially by Written Warning, and when JPMorgan's Human Resources Department indicated such a step was improper, by Action Plan).  (*See* Berenbaum Decl., Ex. 2 at 14-17; Ginsburg Decl., Ex. 10).  Chua also heavily participated in Plaintiff's next performance review, delivered four months later, which drastically lowered his reviews from their consistent level of the past five years and rendered him ineligible for promotion.  (*See* Ginsburg Decl., Ex. 8). Although "[t]emporal proximity alone is insufficient to defeat summary judgment at the pretext stage,… a plaintiff may rely on evidence comprising her

prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment at that stage." *Zann Kwan*, 737 F.3d at 847.  The temporal proximity of Chua's adverse actions, combined with the inconsistency of explanations discussed *supra*, would suffice to defeat summary judgment at the third step of the *McDonnell Douglas* test.

## CONCLUSION

Plaintiff has met his burden to establish a prima facie case with regard to discriminatory failure to promote, and has raised sufficient evidence to suggest that Defendant's proffered justification is pretextual.  Plaintiff has also met his burden to establish a prima facie case with regard to retaliation, and Defendant has put forward no nonretaliatory justification for its negative performance reviews and other disciplinary action.  Accordingly, Defendant's motion for summary judgment is DENIED in its entirety.

The Clerk of Court is directed to terminate Docket Entry 29, and the parties are directed to appear before the Court for a status conference on **Wednesday, March 4, 2015, at 4:00 p.m.**

SO ORDERED.

Dated:   February 18, 2015
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge